Submitted June 29, vacated and remanded December 29, 2010, petition for review denied June 10, 2011 (350 Or 423)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JONATHAN R. OLINGER,
*Defendant-Appellant.*

## Washington County Circuit Court
C070774CR; A139190

246 P3d 20

Peter Gartlan, Chief Defender, Appellate Division, and Joshua B. Crowther, Senior Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Anna M. Joyce, Assistant Attorney General, filed the brief for respondent.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.

ROSENBLUM, J.

**ROSENBLUM, J.**

Defendant appeals his convictions of unlawful manufacture of marijuana, ORS 475.856; unlawful delivery of marijuana, ORS 475.860(2); and unlawful possession of marijuana, ORS 475.864. He assigns error to the denial of his pretrial motion to suppress evidence. Defendant contends that a sheriff's deputy illegally trespassed on the curtilage of his home to make observations that were later used by the deputy and his partner to obtain defendant's consent to a search of his house, which yielded the evidence of the crimes. We review the trial court's denial of a motion to suppress evidence for errors of law. *State v. Hinds*, 225 Or App 470, 474, 202 P3d 187, *rev den*, 347 Or 43 (2009). Because factual issues remain to be resolved before the issues that the parties raise on appeal can be addressed, we vacate the trial court's judgment and remand for further proceedings.

Unless otherwise noted, the following facts are uncontroverted. Around 9:50 in the evening on May 30, 2006, Deputies Haxton and Brown arrived at defendant's residence to serve an arrest warrant on a woman who was last known to live there. When Haxton and Brown arrived, the lights in the house were off. Haxton proceeded to the front door, shined a flashlight through a window by the front door and noticed "a hood of a car in the living room." He then knocked on the door and, when no one answered, he presumed that no one was home. Meanwhile, Brown walked around the side of the house to an offshoot of the driveway, where a car was parked. The car had no license plates, the bumper was off, and it was "filled with boxes and stuff." Brown observed the car's vehicle identification number (VIN), reported the VIN to dispatch, and received information that the car was stolen.[1]

While the deputies were still at the residence, defendant, a man, arrived at the house. Haxton explained to defendant that the deputies were there to serve an arrest warrant on a woman thought to live at the house. After questioning,

---

[1] The trial court found that both deputies went to the front door and then later "noticed a vehicle without license plates parked in an offshoot of the driveway. Deputies looked inside and concluded that the vehicle was stolen." The finding that both deputies went to the car and looked in it is not substantiated by the record. Both deputies testified that, initially, only Brown went to the car.

defendant said that he had been living at the house for about three weeks and that the car was his.

Haxton then asked defendant if the deputies could look at the car, but he did not explain to defendant that they had already checked the car's VIN and knew that the car was stolen. Defendant consented, and both deputies looked at the car and the VIN; they did not see anything new. Haxton asked for permission to look in the house, and defendant said no.

At that time, Haxton also asked if he could search defendant's person, and defendant consented. That search uncovered more than $1,100 cash in defendant's wallet, mostly in $20 bills. Defendant said that he did not know where the money had come from. Haxton told defendant "it was a lot of money for not knowing where it came from," that he knew the car was stolen, and that between the two, it "didn't look good." Brown then read defendant his *Miranda* rights.

At that point, Haxton explained that he wanted to search the house for "stolen car parts" and also asked whether or not defendant was growing marijuana. Defendant looked nervous and did not respond. Haxton asked if defendant had a medical marijuana card, and defendant replied that he was in the process of doing the paperwork. Haxton then "asked him if he was using hydroponics or dirt, just another stab at the—at the grow part, and he said he was using both." When asked how many plants he had, defendant eventually replied that he had more than 12.

Haxton again asked if the deputies could search the house and defendant again refused consent. At that point, Haxton told defendant:

"he's got a stolen car in his driveway that had been parted out, basically. He had $1,100 basically in cash in $20's on him. He had car parts inside of his house that we could see and that he had already admitted that he had a grow inside his house.

"So, with those things I told him * * * that we were basically going to apply for a warrant and if the judge signs off on it then we're searching his house, anyways."

Defendant was then told that he could either consent or the deputies would apply for a search warrant. Defendant asked if he was going to jail, and no promises were made. At that point, defendant agreed to sign a "Consent to Search Disclaimer"[2] that was offered to him by Haxton, and he let the deputies in the front door of the house. The deputies searched the house and found approximately 50 marijuana plants, marijuana-growing equipment, a suitcase full of marijuana, more individually packaged bags of marijuana, marijuana seeds, drug records, and a locking-style suitcase safe with $2,470 in it. Defendant was subsequently charged with unlawful manufacture, delivery, and possession of marijuana.

Prior to trial, defendant moved to suppress all evidence obtained as a result of the search of the car, the search of the house, and his statements, arguing that that evidence was derived from the initial warrantless search of the car. Defendant specifically argued that Brown trespassed on the curtilage of defendant's property, where he observed the car's VIN, and that Brown thus conducted a search in violation of Article I, section 9, of the Oregon Constitution.[3] Defendant further argued that the deputies exploited that unlawful search to elicit his subsequent statements, his consent to search the car again, and his consent to the search of the house.

At the suppression hearing, Haxton testified that the property had a U-shaped driveway with a path leading from the driveway to the front door, that the car was parked

---

[2] According to Haxton, the consent form stated:

" 'I understand the police do not have a search warrant. I understand that I have the right to refuse the search and that should I give my consent to search I have the right to stop the search at any—any time until the warrant is obtained by the police officer. I am at this time voluntarily giving my consent to law enforcement officer'—slash '(s)' for multiple—'to search my'—fill in the applicable boxes, and then we put the residence, his address. And down at the bottom it's got a place for him to sign."

[3] Article I, section 9, of the Oregon Constitution provides, in relevant part, that "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *." In support of his motion to suppress, defendant also cited, but did not make any arguments relying on, the Fourth Amendment to the United States Constitution. Defendant did not raise any Fourth Amendment arguments on appeal.

in "like a driveway that's been added on" that was "around the side of the house," and that there was no paving or sidewalks anywhere around the house. Defendant also testified about the layout of the property. He testified that where the car was parked was not a "driveway that's been added on," as Haxton had characterized it, but was a dirt area where a wood shed had previously been constructed. Defendant testified that the house had a back door but no side door, and that the residence was set apart from all other buildings in the area.

Following that testimony, the trial court made findings of fact and denied the motion, concluding that defendant's consent to search the house was "freely, voluntarily and intelligently given without threat or coercion," and that the deputies "had plenty of probable cause at the point that they asked for and told the defendant that they would get a search warrant." The court did not rule on defendant's argument that, to conduct the initial search of the car, Brown had to illegally trespass on defendant's curtilage; furthermore, the court's only finding of fact relating to the question of whether the car was located in an area where Brown may have been trespassing was that the car was "parked in an off portion, or an offshoot of the driveway." Defendant was subsequently convicted on all charges.

On appeal, defendant does not challenge the trial court's conclusion that his consent was voluntary. However, he renews his arguments (1) that Brown conducted an unlawful search by trespassing onto defendant's curtilage to observe the VIN of his car, and (2) that the deputies unlawfully exploited the information obtained as a result of that search—that the car was stolen—to gain defendant's consent to again search the car and then the house.[4] Therefore, defendant argues, the trial court erred by denying his motion to suppress. The state responds that Brown lawfully entered the curtilage of defendant's residence, and that, even if Brown's search of the parked car was unlawful, the deputies did not exploit that illegality to gain defendant's consent.

---

[4] On appeal, defendant does not renew his argument that his statements regarding a marijuana-growing operation also should have been suppressed.

The initial issue in this case is whether Brown, after it was determined that no one was home, had the authority to look in the car that was parked on the side of the house and thus gain information that the car was stolen; specifically, did Brown have implied consent to enter the area on the side of the house? If he did, the VIN was in plain view and his observation of it was not a search. *State v. Foster*, 347 Or 1, 5, 217 P3d 168 (2009) (an observation from a lawful vantage point is not a search under Article I, section 9); *State v. Ohling*, 70 Or App 249, 252, 688 P2d 1384, *rev den*, 298 Or 334 (1984). However, if Brown's entry onto that area of the curtilage was not pursuant to defendant's implied consent, his intrusion was a trespass, and thus a search in violation of Article I, section 9. *City of Eugene v. Silva*, 198 Or App 101, 107, 108 P3d 23 (2005); *State v. Somfleth*, 168 Or App 414, 424, 8 P3d 221 (2000).

To determine whether a deputy has implied consent to invade the curtilage of a residence, we treat "location as, in effect, giving rise to rebuttable 'presumptions.' " *Somfleth*, 168 Or App at 424. Given prevailing social norms, members of the public, including police, are presumed to have implied consent to approach a home to perform "those acts reasonably undertaken to contact the residents of the home[.]" *State v. Cardell*, 180 Or App 104, 108, 41 P3d 1111 (2002). Therefore, going to the front door and knocking is not a trespass. *Ohling*, 70 Or App at 253. Likewise, police enjoy a limited presumption of implied consent to enter an area of a residence's curtilage that they must traverse in order to approach the front door, typically a driveway, a front yard, or other pathway ordinarily used by visitors to contact the resident. *E.g.*, *City of Eugene*, 198 Or App at 107 (quoting *Somfleth*, 168 Or App at 424-25) (a homeowner is "presumed to have implicitly consented to entry into the front yard to approach the front door"); *Foster*, 347 Or at 5-6.

Entry onto the property for purposes other than to contact persons at the front door, however, is a different matter. Such intrusions onto a home's curtilage are presumptively trespasses, unless the circumstances so strongly evince an invitation to the public that it can be said that the homeowner has implicitly invited entry. *State v. Pierce*, 226 Or App 336, 343-45, 203 P3d 343 (2009); *Somfleth*, 168 Or App

at 425; *State v. Glines*, 134 Or App 21, 25, 894 P2d 516, *rev den*, 321 Or 512 (1995).

■     In this case, the state argues that it is no less common or acceptable for the public (and thus the police) to be in an offshoot of a driveway with a parked car in it than it is for the public to be in the driveway itself, at least absent any evidence of the resident's intent to exclude the public from that area. Thus, in the state's view, we must presume that defendant implicitly consented to public entry into that area unless there is evidence that defendant intended to exclude the public, which, the state contends, there is not.

■     We disagree that that is the appropriate analysis. The presumption of implied consent to enter does not necessarily extend to all portions of a driveway. *See Pierce*, 226 Or App at 345-46 (police did not have implied consent to walk up a driveway that extended along the side of the defendant's house and look in the backyard). The mere fact that the "offshoot" on which the car was parked may have been connected to, or part of, the driveway, is not dispositive. Rather, it is the location of the offshoot that matters. The uncontroverted evidence in the record here shows that the portion of the offshoot where the car was parked was on the side of the house— beyond the area in which implied consent is presumed.

       Thus, Brown's entry into the area on the side of the house is presumptively a trespass unless there is evidence in the record of circumstances that evince implied invitation to the public to enter that area. The state points to no such evidence, and our review of the record reveals none.[5] There is no evidence of, for example, a side entrance—let alone a side entrance with a doorbell or other indications that the public is invited to use that entrance, *cf. Glines*, 134 Or App at 23-25—or any other feature of the structure or the surrounding landscape or the layout of the property that suggests an invitation to the public to enter. It follows that Brown's entry

_____

[5] The trial court made no findings of fact concerning the location of the car or the surrounding circumstances beyond finding that the car was "parked in an off portion, or an offshoot of the driveway." However, it is incontrovertible that the car was parked on the side of the house—both the state and defendant presented evidence to that effect. Furthermore, given the absence from the record of any evidence of circumstances that evince implied consent to enter that area of the property, we can say, as a matter of law, that consent was not implicit.

into that area to examine the car constituted an unlawful search.[6]

As noted, the state argues that, even if the police obtained the information that the car was stolen from an illegal search, defendant's consent did not derive from that search for two reasons. A ruling in the state's favor on that issue would obviate the need for a remand, so we consider the state's arguments here. First, the state contends that defendant failed to establish a minimal factual nexus between the search of the car and his consent to the search of the house. Second, it argues that, even if there was a factual nexus, any taint from the search of the car was attenuated by the "collection of warnings" that the deputies gave defendant before he consented—specifically, the *Miranda* warnings and the statement on the "consent to search" form that informed defendant that he had the right to refuse the search. The trial court did not rule on either of those questions, nor did it make any express findings relating to those issues. For that reason and the reasons that follow, neither of the state's arguments can be resolved on the factual record before us.

■  As to the state's first argument, when seeking to suppress evidence on the ground that it derived from illegal police activity, a defendant must establish a "minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct * * *." *State v. Hall*, 339 Or 7, 25, 15 P3d 908 (2005). The state contends that defendant cannot establish with any certainty that, "but for" the deputies' knowledge that the car was stolen, they would not have asked for his consent to search the home. The state may be correct as far as its argument goes (an issue we do not decide), but it does not address the complete analysis: A defendant can establish a factual connection not only by showing that the police were prompted by illegally obtained information to seek consent, but also by showing that his or

---

[6] The state no longer makes the argument it made in the trial court that defendant's later consent to the search of the car (after the deputies had already obtained the VIN number and determined that the car was stolen) vitiates any possible earlier illegality. Thus, we do not address it. For purposes of our analysis, we do not distinguish the first search of the car from the second; both searches were illegal.

her decision to consent was "significantly affected" by the unlawful police conduct. *Id.* at 35. Here, in persuading defendant to consent to a search of the house, the deputies repeatedly relied on the information that the car was stolen. That fact could support a finding that defendant's decision to consent was significantly affected by the search of the car.

To be sure, the deputies also relied on other information—the car hood in the living room, the cash on defendant's person, and defendant's admission that he was growing marijuana, none of which defendant challenges on appeal as having been illegally obtained—which could support a finding that the information about the stolen car was not a significant factor in defendant's decision. But, the trial court did not rule or make findings on that issue.[7] Whether defendant established a "but for" relationship between the search of the car and his decision to consent to the search of his house is a matter for the trial court to determine in the first instance.

The same problem prevents us from addressing the state's second argument. If the defendant establishes a factual nexus between evidence obtained in a consent search and unlawful police activity, the state can nevertheless prove that the disputed evidence is admissible by showing, among other things, that the police illegality has "such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence * * *." *Id.* at 25. To determine whether the advice of rights that defendant received was sufficient to purge any taint, we must conduct a "fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct" and defendant's consent to the search of the house. *Id.* at 35. To do so, we must consider the nature and extent of the taint—that is, how significantly, if at all, the fact that the deputies knew

---

[7] Because it did not rule on the issue, we cannot presume that it made implicit findings. *See Ball v. Gladden,* 250 Or 485, 487, 443 P2d 621 (1968) ("If findings are not made on all [historical] facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the ultimate conclusion * * * made by the trial court or jury.").

that the car was stolen affected defendant's decision to consent to the search.

Again, that is a question of fact that the trial court did not resolve. Although the court ruled that defendant's consent was voluntary—meaning that his will was not overborne—that does not necessarily imply that the deputies' knowledge that the car was stolen did not significantly affect his decision to consent. *See id.* at 27 ("[E]ven when a defendant's consent is voluntary—that is, when the defendant's free will has not been overcome by police coercion—that consent is insufficient to establish the admissibility of evidence from a warrantless search if the state cannot prove that the consent was independent of, or only tenuously related to, any preceding violation of the defendant's rights under Article I, section 9.").

Because the trial court did not rule on the issues that the parties raise on appeal, and because unresolved factual questions prevent us from addressing the issues concerning whether defendant's consent to the search of the house derived from the unlawful search of the car, we vacate the judgment and remand for the trial court to resolve those issues in the first instance. If the court rules in the state's favor, it shall reenter the judgment of conviction. However, if it rules in defendant's favor, defendant is entitled to suppression of the evidence that derived from the search and to a new trial.

Vacated and remanded.